UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRIS HANSEN,

                              Plaintiff,

                                                    1:17-cv-01134
v.                                                  (TWD)

WARREN COUNTY, et al.,

                              Defendants.
_____

APPEARANCES:                           OF COUNSEL:

OFFICE OF MARTIN J. MCGUINNESS         MARTIN J. MCGUINNESS, ESQ.
Counsel for Plaintiff
P.O. Box 1006
Saratoga Springs, NY 12866

JOHNSON & LAWS, LLC                    APRIL J. LAWS, ESQ.
Counsel for Defendants                 GREGG T. JOHNSON, ESQ.
648 Plank Road, Suite 204              COREY A. RUGGIERO, ESQ.
P.O. Box 270                           LORAINE CLARE JELINEK, ESQ.
Clifton Park, NY 12065

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**DECISION AND ORDER**</u>

## I.    INTRODUCTION

Plaintiff Chris Hansen ("Hansen") commenced this action against Defendants Warren

County ("County") County Sheriff's Department former Deputy Peyton Ogden ("Ogden"), and

Deputy Daniel Habshi ("Habshi").  (Dkt. No. 2.)  Hansen alleges claims of false arrest and

imprisonment under both 42 U.S.C. § 1983 and state law, Fourth Amendment excessive force

under § 1983, and state law battery against Ogden and Habshi.[1]  *Id*. at 4-6.[2]  Additionally, Hansen alleges that the County is vicariously liable with respect to the state law claims of false arrest/imprisonment and battery.[3]  *Id*.

The matter is now before the Court on Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 26.)  Hansen has filed a response in opposition to the motion, and Defendants have filed a reply.  (Dkt. Nos. 28 and 29.)  For reasons explained below, Defendants' motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    Events Leading Up to the Arrival of the Defendant Deputies

At around 5:00 or 6:00pm on October 23, 2016, eleven year old Gian Canale ("Gian"), the son of Gina Canale ("Canale"), knocked on the door of neighbors John LaBombard and his wife, Catherine, and told them that his mother was going wild and had hit him.  (Dkt. No. 28-8 at 3, 5-6.)  When Mr. LaBombard attempted to take Gian home, Gian came running out the door with his mother chasing him before LaBombard could even get down the driveway, so LaBombard took Gian back to his house.  *Id*. at 7.   The LaBombards attempted to call Gian's uncles Billy and Greg Canale at Gian's request, but they were unable to reach Greg, and while Billy initially indicated he would not come to the house, he ultimately agreed.  *Id*. at 8.

---

[1] Plaintiff has withdrawn a state law negligence claim against Ogden and Habshi.  (Dkt. No. 28.)

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] Plaintiff has clarified in his opposition to Defendants' motion that he is not pursuing a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978), against the County with regard to his § 1983 claims, only a *respondeat superior* liability claim with regard to his state law claims for false arrest/imprisonment and battery.  (Dkt. No. 28 at 23-24.)

When Billy did not arrive, Mr. LaBombard told Gian he was going to call Hansen, whom Gian refers to as his father. (Dkt. No. 28-8 at 8.) According to Mr. LaBombard, Hansen and Gian's mother had previously been in a thirty-plus year relationship and had co-parented Gian, who had been adopted by Gina. *Id.* at 8-9, 21. Hansen did not want to come over but LaBombard kept after him, and he finally agreed. *Id.* Hansen was told that Gian and Canale were arguing, and Canale was intoxicated and her behavior was irrational. (Dkt. No. 28-5 at 12.) Hansen claims that prior to the time he went to the LaBombards' house, he had also received calls regarding the ongoing incident from Mrs. LaBombard, Canale, and Karista Mechanick ("Mechanick"), who lived in North Carolina but, along with her twelve year old daughter, Chloe, was temporarily living with Canale so that she could take care of her terminally ill mother. (Dtk. Nos. 28-5 at 8; 28-7 at 3, 5-6.) The calls led Hansen to contact Canale's brother Billy and ask him to come pick up Gian and keep him for the night. (Dkt. No. 28-5 at 8-9.)

According to Hansen, he drove to the LaBombard residence at around 8:15pm and was met in the driveway by Mr. LaBombard. (Dkt. No. 28-5 at 11-12). Hansen and Canale have offered conflicting versions of what happened next, with Mr. LaBombard generally supporting Hansen's version. (Dkt. No. 28-8 at 12-16.) Hansen claims that after going inside the LaBombard residence to comfort Gian and calm him down, he went back outside to speak with Mr. LaBombard, who began explaining the situation with Canale. (28-8 at 11.) Hansen claims that at that point Canale ran from her house to the LaBombard's and spit on Hansen and began assaulting him, leading Hansen to use a restraint technique he had learned as a corrections officer to lead her back to her house. (Dkt. Nos. 26-7 at 7; 28-5 at 13-17; 28-8 at 12-13.) Hansen contends that Canale broke free fifty or sixty feet from her home and ran home with him running after her. (Dkt. No. 28-5 at 16.)

According to Hansen, he stopped at a car parked in front of the garage upon seeing Mechanick's daughter, Chloe, crying inside the vehicle. (Dkt. No. 28-5 at 17-18). The car door was locked so Hansen knocked on the window, which Chloe then rolled down. *Id*. at 18. Hansen asked Chloe what was going on, and Chloe told Hansen that Canale had hit Mechanick, her mother, and was going to hurt her further. *Id*. Hearing this, Hansen told Chloe to put the window back up and ran into the garage where Canale swung a snow shovel at him. *Id*. 18-19. Hansen claims that Canale then ran into the kitchen while he went into the living room to call out to Mechanick, who was likely upstairs. *Id*. at 21-22. Canale then struck Hansen three or four times in the neck and head from behind. *Id.* at 22. In response, Hansen turned and pushed Canale, causing her to land on the couch on her side with her feet dangling on the floor. (Dkt. Nos. 28-5 at 23; 28-6 at 28.) Hansen claims Canale tried to get up and swing at him, but he restrained her by standing and leaning on her, putting his left hand on her right shoulder and his left knee on her right hip. (Dkt. No. 28-5 at 24). While maintaining this position, Hansen reached in his pocket, pulled out his cell phone and called Billy Canale. *Id*. Billy Canale answered the phone and informed Hansen he was about ten minutes away, to which Hansen responded to hurry. *Id*. at 25.

In contrast to Hansen's description of events, Canale has stated in her affidavit that she was already at the LaBombard residence when Hansen arrived, and the two engaged in a shouting match with him yelling at her to go home and her telling him she was getting her son. (Dkt. No. 26-5 at ¶ 3[4].) Canale contends that Hansen then grabbed her by her ponytail and dragged her back to her house, pushed her to the ground, grabbed her by the hair, and dragged

---

[4] Paragraph references are used where the referenced document contains consecutively numbered paragraphs throughout.

her through the garage into the living room. *Id*. According to Canale, Hansen then pushed her onto the couch and stood on top of her, choking her to the point that she was having difficulty breathing. *Id*.

## B.   Law Enforcement Involvement and Hansen's Arrest

Mr. LaBombard testified at his deposition that Canale had at some point called the police and reported that the LaBombards had kidnapped her son. (Dkt. No. 28-8 at 15-16.) According to Ogden, on October 23, 2016, during his patrol, he heard a general dispatch call for a custodial interference dispute at Brookshire Trace in the Town of Queensbury.[5] (Dkt. No. 26-3 at ¶ 7.) The call indicated only that a mother was complaining about unidentified individuals kidnapping her son. *Id*. While driving to Brookshire Trace, Ogden also heard radio calls that an additional child was involved and was hiding in a car, and that the dispute had escalated into a physical domestic dispute.[6] *Id*. Although Ogden knew that Habshi was also responding to the call, Ogden was the only officer on the scene when he arrived. *Id*. at ¶¶ 7-8; Dkt. No. 26-9 at 11.

There are conflicting accounts as to what transpired after Ogden's arrival. According to Ogden, upon exiting his car, he observed an adult female, later identified as Mechanick, exiting the Canale residence. (Dkt. No. 26-3 at ¶ 10.) Before communicating with Mechanick, Ogden

---

[5] A transcript of the pre-arrest radio calls to and from Ogden and Habshi regarding the situation at 7 Brookshire Trace shows the Dispatcher informing Habshi at 8:45pm that Canale had called the police regarding the neighbors refusing to turn over her son to her or let him come to the door. (Dkt. No. 26-8 at 2.)

[6] The transcript also shows the Dispatcher informing Habshi and Ogden at 8:54 and 8:57pm that the situation at 7 Brookshire Trace had turned into a domestic dispute between the homeowner and a female acquaintance, presumably Mechanick, and a seven-year old child hiding in a vehicle in the driveway, presumably Chloe. *Id*. at 2-3. According to Mechanick, her daughter Chloe, who was frightened, had called her father, who in turn called the police. (Dkt. No. 26-14 at 10-11.) This appears to be confirmed by the transcript of the communications between the Dispatcher and Ogden and Habshi. (Dkt. No. 26-8 at 2-3.)

heard yelling and what sounded like an active fight inside the house.  *Id*.  He immediately

entered the house and upon hearing obvious sounds of distress from a female and an active fight,

entered a large room where he "observed the Plaintiff, a large adult male approximately [his]

same size and stature, standing over a smaller adult female who was in the fetal position in a

protective position lying on a couch."  *Id*.  Ogden "observed that Plaintiff's hands were on the

female's neck area and that he was holding/pushing her down on the couch . . . and [b]ased on

[his] observation of Plaintiff and sounds of distress from the female, [he] concluded that Plaintiff

was choking the female and restraining her in a manner that was causing her obvious distress."

*Id*.

According to Ogden, because the incident unfolded so quickly, he could not recall the

exact language he used when announcing his presence as a law enforcement officer and ordering

Hansen to get off the victim and get down on the ground.  *Id*. at ¶ 12.  Ogden claims that when

Hansen did not immediately comply with his commands and stop choking Canale, he began to

close the distance while continuing with loud verbal commands.  *Id*.  Ogden states in his affidavit

that there is no doubt in his mind that Hansen heard his commands because as Ogden got closer,

Hansen turned towards him and assumed a "fighting" stance.  *Id*.  Ogden claims to have

immediately used a takedown technique to get Hansen to the floor before he had a chance to

strike Ogden.  *Id*.  Ogden contends that because he was the only officer on the scene and did not

know if Hansen had access to weapons or there were any other threats in the house, and Hansen

squared off at him instead of complying with his commands to "get down," along with the close

proximity of Canale, he was left with no choice but to take Hansen down.  *Id*. at ¶ 13.

Ogden described the take down technique used by him as placing his foot behind

Hansen's feet and using his arms and upper body to turn Hansen and take him to the floor, with

Ogden's body following to get Hansen's face down on the floor with Ogden on top to minimize any injury to either of them. *Id*. at ¶ 14. According to Ogden, he did not land directly on top of Hansen and therefore was unable to maintain control over him when he actively resisted. *Id*. Ogden claims Hansen repeatedly refused to follow Ogden's command to give him his hands so he could handcuff him, instead putting his hands under his body, trying to turn to Ogden, and trying to get up. *Id.*

Ogden claims that given Hansen's resistance, he had no choice but to use "hard-hand techniques," including striking Hansen's forehead and delivering several blows to Hansen's ribs. (Dkt. No. 26-3 at ¶ 15.) At his deposition, Ogden was unable to recall how many times he used the hard-hand technique on Hansen. (Dkt. No. 28-9 at 25.) Ogden contends the technique worked, and he was able to grab one of Hansen's hands. *Id.* At that point, Habshi arrived at the scene and was able to pry Hansen's other hand from under his body so he could be handcuffed and then assisted to his feet. *Id*. at ¶¶ 15-16.

According to Hansen, he was still on the phone with Billy Canale and simultaneously restraining Canale when he heard a loud voice say "stop" a single time. (Dkt. Nos. 28-5 at 25-26; 28-6 at 32.) Hansen looked briefly in the direction of the voice and saw the silhouette of an individual he could not identify but later learned was Ogden. (Dkt. Nos. 28-5 at 26-27; 28-6 at 31, 33.) Hansen claims Ogden was standing in the foyer of the living room behind a high-back chair and a lamp with a flashlight pointed up to the ceiling in his hand. (Dkt. No. 28-5 at 26-27.) In contrast to Ogden's description of what transpired, Hansen testified at his 50h hearing and deposition that five to ten seconds after hearing Ogden say stop, Ogden grabbed him from behind. (Dkt. Nos. 28-5 at 25; 28-6 at 33; 28-7 at 27, 29.) Ogden came around Hansen's neck, pulling Hansen backwards on top of him. (Dkt. Nos. 28-5 at 33; 28-7 at 27-29.) Hansen claims

Ogden then flipped him over and slammed him onto the floor. (Dkt. Nos. 28-5 at 33; 28-6 at 34; 28-6 at 27-29.) In the process of being flipped over, Hansen's head struck the entertainment system causing his head to split open and a momentary loss of consciousness.[7] (Dkt. Nos. 28-5 at 31, 33; 28-6 at 27-29.) Ogden does not recall if Hansen hit his head on anything during the takedown but has acknowledged it was possible. (Dkt. No. 28-9 at 20-21.)

Hansen testified that upon regaining consciousness, he was on the floor on his stomach with Ogden on top of him, and that Ogden struck him in the right side of his ribs four or five times with his fist. (Dkt. Nos. 28-5 at 31, 33; 28-6 at 3-4, 9, 11.) According to Hansen, he asked Ogden multiple times to get off him because he could not breathe. (Dkt. Nos. 28-5 at 25, 34-35; 28-6 at 36.) Ogden responded by telling Hansen to give him his hands, which were on the floor underneath Hansen's stomach. (Dkt. No. 28-5 at 28, 30). Hansen contends he complied, and Ogden proceeded to handcuff him behind his back, get off him, and stand him up. *Id.* at 32, 34. Hansen claims it was not until that point that he realized Ogden was a Warren County Sheriff's Department Deputy. *Id.* at 25. Ogden walked Hansen out the front door and put him into the back of the police car. *Id.* at 30. From the moment Ogden told Hansen to stop, roughly a minute to a minute and a half elapsed before Hansen was handcuffed. *Id.* at 28.

Habshi did not arrive at the scene until Ogden already had Hansen face down on the floor and was attempting to handcuff him. (Dkt. No. 26-4 at ¶ 14.) According to Habshi, when he entered the Canale residence through the garage, he heard a female screaming and followed the screams into the living room where he saw Canale standing with her back against the wall, and Ogden kneeling on the floor at Hansen's side commanding Hansen to give him his hands, while

---

[7] Plaintiff testified he believes his head may actually have struck the coffee table, but he was unsure. (Dkt. No. 28-5 at 32-33.)

Hansen instead tried to tuck them under his body.  *Id.*  Habshi saw Ogden strike Hansen in the rib area and assisted Ogden in handcuffing Hansen.  *Id.*  Habshi claims that Hansen was actively resisting both officers yelling at them to get off him.  *Id.*  Based upon his review of audio recordings of radio dispatches he heard from 8:45pm until his 9:01:19pm call out that Hansen was in custody, Habshi concluded that: (1) he arrived on the scene eighty-one seconds after Ogden, and therefore Ogden was almost certainly not in the living room with Hansen for more than eighty-one seconds; and (2) less than two minutes and forty-five seconds elapsed from the time he arrived at the scene to the time he and Ogden placed Hansen in the patrol car.  *Id* at ¶ 16.  Habshi then began taking witness statements as was his practice.  *Id*. at ¶ 18.

Canale submitted an affidavit in support of Defendants' motion in which she states that Hansen was on top of her choking her when Ogden came in and told Hansen to "get off her." (Dkt. No 25-5 at ¶¶ 3-4.)  According to Canale, as soon as Hansen got up, Ogden tackled him and began to punch Hansen in the side once he was down.  *Id*. at ¶ 4.  In her affidavit, Canale refers to a sworn statement written by Habshi, which she signed on October 23, 2016, and states she was very upset and intoxicated at the time and did not read the statement fully and believes the information in her affidavit is accurate.  *Id*. at ¶ 5; Dkt. No. 26-10 at 2-3.[8]  In the sworn witness statement, taken by Habshi within two hours of Hansen's arrest, Canale stated that after Hansen pushed her on the couch, he was off and on choking her, and she was having difficulty breathing.  (Dkt. No. 26-10 at 2.)  Canale also stated that Hansen was punching and slapping her in the head, and that while she was being beaten by Hansen, Ogden came in and started

---

[8] Habshi testified at his deposition that although Canale reported that she had consumed wine earlier in the evening, throughout the interview she maintained normal eye contact, was able to comprehend his questions, was responsive, and did not slur her speech. (Dkt. No. 26-4 at ¶ 19.)

screaming at Hansen to get off her. *Id*. According to Canale, Hansen kept choking her, and when Ogden pulled him off her, Hansen squared up like he wanted to fight with Ogden. *Id*. When Hansen refused a command to get on the ground, Ogden took him to the floor, and Hansen resisted Ogden's command to put his hands behind his back. *Id.* at 3.

Mechanick testified at her deposition that she saw Hansen and Canale on the sofa, and that Canale's knees were on the ground and her belly was on the sofa cushion, and Hansen was above her with his hands on her shoulder blades holding her down with his knee on the lower part of her back. (Dkt. No. 26-14 at 4.) Hansen was on Canale's right side holding her because, as Mechanick testified, "she was ballistic." *Id*. Mechanick described Hansen's left hand as being between Canale's shoulder blades, not on her neck, and testified there is no way possible he was grabbing Canale's throat. *Id*. at 5. Mechanick described Hansen's right hand as holding his cell phone and Hansen as screaming repeatedly, "Billy, where are you; hurry up." *Id*.

Mechanick testified she saw Ogden enter the living room from the left of the stairway, and Hansen's back was turned away from Ogden. *Id*. at 6-7. According to Mechanick, Ogden immediately screamed at Hansen and went right to him, put his arm around his neck in like a "choke hold." *Id*. at 7, 9. Mechanick testified that Ogden then slammed Hansen to the ground, Hansen fell on top of Ogden, and Ogden flipped Hansen over and slammed him into the entertainment center. *Id*. Mechanick denied that Hansen ever turned around and assumed a fighting posture toward Ogden. *Id*. at 8-9.

As a result of his encounter with Ogden, Hansen sustained a laceration on the right side of his forehead from hitting the entertainment center and bruises under his eye and right rib area. (Dkt. Nos. 28-5 at 40; 28-6 at 35-36; 28-8 at 20-21; 28-17 at 7, 9, 11.) The laceration on Hansen's forehead was bleeding profusely and his shirt was drenched in blood at the scene.

(Dkt. Nos. 28-6 at 40; 28-8 at 20-21.)  An ambulance was called and five to ten minutes later Hansen was taken to the Emergency Room at Glens Falls Hospital where he was given a CT scan and had seven stiches to the laceration above his eye. (Dkt. Nos. 26-6 at 6-7; 28-6 at 41; 28-17 at 2.)  Ogden injured the knuckle area of the hand he had used to hit Hansen and had it evaluated at the Glens Falls Hospital.  (Dkt. No. 28-9 at 27.)

Mr. LaBombard was able to see Hansen in the ambulance before it left for the hospital. (Dkt. No. 28-8 at 19-20.)  According to LaBombard, Hansen's face was "beat to crap," his face was bleeding, and there were bruises and marks on his face.  *Id*. at 20-21.  LaBombard testified at his deposition that he saw Hansen the next day and described his appearance as "beat up," "punched and scabbed," with "bruising" and "swelling."  *Id*. at 24-25.

Upon leaving the hospital, Hansen, still handcuffed, was transported by a sheriff's car to the County Sheriff's Department and taken to the booking area.  (Dkt. Nos. 28-5 at 41; 28-6 at 42-43.)  Hansen was charged with criminal obstruction of breathing (N.Y. Penal Law § 121.11), resisting arrest (N.Y. Penal Law § 205.30), unlawful imprisonment (N.Y. Penal Law § 135.05), and harassment (N.Y. Penal Law § 240.26).  (Dkt. No. 26-9 at 5.)  The arrest report lists Ogden as the arresting officer and Habshi the assisting officer.  *Id.*

After an hour in the booking area, Hansen was detained in the County Correctional Facility.  (Dkt. No. 28-6 at 44.)  Hansen's handcuffs were removed, and he was placed in an individual holding cell overnight.  *Id*. at 44-46.  The next morning, Hansen was handcuffed, removed from his cell, and led out of the jail into a sheriff's car where he was transported to the Town of Queensbury Court for arraignment, then released from the custody of the County Sheriff's Office.  *Id*. at 7, 46-47.  On May 11, 2017, an order of protection preventing Hansen from having any contact with Canale was extended to April 30, 2018, the charges against Hansen

were adjourned in contemplation of dismissal, and the Warren County Court required Hansen to attend a violence intervention program.  (Dkt. No. 28-15 at 2-3.)

## III.   LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at the point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    ANALYSIS

### A.    False Arrest/Imprisonment Claims Under 42 U.S.C. § 1983 and New York State Law

#### 1.    Legal Standards

The elements of Fourth Amendment false arrest or false imprisonment claims brought under 42 U.S.C. § 1983 are substantially the same as a claim for false arrest claim under New York law.[9] *Weyant v. Okst*, 101 F.3d 845, 852-53 (2d Cir. 1994)  "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged."  *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir. 2003) (punctuation and citation omitted).  Where "an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense."  *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (citation omitted).

To avoid liability on a claim for false arrest, "an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he had qualified immunity."  *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Weyant*, 101 F.3d at 852).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Weyant*, 101 F.3d at 852.  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

---

[9]  Claims for false arrest and false imprisonment are synonymous under New York law. *See Jackson v. City of New York*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013).

In general, an arresting officer has probable cause to arrest if he "has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed *any* crime." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (emphasis added) (citations omitted). "[A] plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (following *Devenpeck* in holding that "a plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest"). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983) (internal quotation marks omitted)). Once a police officer "has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Wieder v. City of N.Y*, 569 F. App'x 28, 29-30 *2d Cir. 2014) (quoting *Ricciuti v. NYC Trans. Auth.*, 124 F.3d 123, 128 (2d Cir. 1977)). "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Panetta v. Crowley*, 460 F.3d 38, 395 (2d Cir. 2006).

The question of whether probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers or may require a

trial if the facts are in dispute. *Weyant,* 101 F.3d at 852 (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118–19 (2d Cir. 1995); *Moore v. Comesanas,* 32 F.3d 670, 673 (2d Cir.1994)).

Even without probable cause to arrest, "an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) ("in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity") (citations omitted).

2.    Analysis

Hansen was arrested on charges of criminal obstruction of breathing, resisting arrest, unlawful imprisonment, and harassment, arising out his holding Canale down on the sofa and allegedly choking her and resisting arrest. (Dkt. No. 26-9 at 5.) The Court finds that both Ogden, the arresting officer, and Habshi, the assisting officer, had probable cause to arrest Hansen and are, therefore entitled to summary judgment on both his § 1983 and state law claims for false arrest/imprisonment.[10]  Moreover, even if the officers did not have probable cause, they had arguable probable cause entitling them to qualified immunity on both the § 1983 and state law false arrest claims. *See Escalera,* 361 F.3d at 743; *Jenkins v. City of New York*, 478 F.3d 76, 86-87 (2d Cir. 2007) (while qualified immunity is not generally understood to protect officials

---

[10]  Inasmuch as the Court is granting summary judgment to Ogden and Habshi on Hansen's state law false arrest/imprisonment claim, it is unnecessary to address his *respondeat superior* claim against Warren County with regard to that claim.

from state law claims, because a similar doctrine exists under state law, if defendant law enforcement officers were entitled to qualified immunity under federal law, summary judgment is similarly appropriate on plaintiff's state law false arrest claim.) (citations omitted).

The Court finds that despite the dispute among the parties over whether Hansen had his hands around Canale's neck and was choking her when Ogden arrived and heard Canale screaming and saw, Hansen restraining Canale, the circumstances surrounding Hansen being taken down by Ogden, and whether Hansen resisted being handcuffed, there is sufficient undisputed evidence to establish that Ogden and Habshi had probable cause to believe that Hansen had committed some crime in connection with his actions towards Canale and to arrest him. *See Zellner,* 494 F.3d at 369; *Jaegly,* 439 F.3d at 153-54.

It is undisputed that Ogden and Habshi had been informed that there was a report of an ongoing domestic dispute at the Canale residence before their arrival; Hansen was restraining Canale on the couch and she was screaming when Ogden came into the living room; Hansen admitted that he did not stop restraining Canale when Ogden yelled "stop" and before Ogden took him down; and Defendants had a sworn statement from Canale taken at the scene that Hansen had been choking her, causing difficulty in her breathing. *See Wesby,* 138 S.Ct. at 586 (probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity.") Moreover, a law enforcement officer is entitled to rely on information received from fellow officers to effect a lawful arrest. *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). Therefore, Habshi was entitled to rely on information received from Ogden regarding the incident between Hansen and Canale that Ogden had observed.

Even if an argument can be made that Ogden or Habshi were mistaken in some way regarding the incident between Hansen and Canale, and Hansen's actions after being taken down

by Ogden, arguable probable cause for arrest existed because it was objectively reasonable for them to believe that Hansen had committed a crime in his restraint of Canale and failure to get off her upon command. *See Escalera,* 361 F.3d at 743. Therefore, Ogden and Habshi would be entitled to qualified immunity on Hansen's false arrest/imprisonment claims under § 1983 and state law in the event they are not entitled to summary judgment based upon a finding of probable cause. *See Zellner*, 494 F.3d at 369; *Caldarola,* 298 F.3d at 162 ("in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity").

### B.    Excessive Force Under 42 U.S.C. § 1983

#### 1.    Legal Standard

The Supreme Court has held that claims law enforcement officials used excessive force in the course of making an arrest are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "A claim that excessive force was used in the course of a seizure is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000); *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (because the test is one of objective reasonableness, the inquiry is fact specific and requires a balancing of various factors). Under the objective reasonableness standard, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive

force claim is not appropriate unless no reasonable fact finder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citation omitted).

"Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts (citations omitted), if there is such a dispute, the factual questions must be resolved by the fact finder (citations omitted)." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). "If there is a question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury." *Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006).

2.    Claim Against Defendant Habshi

Defendants Ogden and Habshi have both stated in affidavits that Habshi did not arrive in the living room of the Canale home until Ogden had Hansen on the floor and was attempting to handcuff him, and that Habshi's only involvement at that time was pulling Hansen's arm from under his body so he could be handcuffed. (Dkt. Nos. 26-3 at ¶ 15; 26-4 at ¶ 14.) Hansen testified at his deposition that he had no recollection of Habshi having any physical contact with him, and when asked if he knew why Habshi was being sued, Hansen responded he did not. (Dkt. Nos. 26-7 at 5; 26-16 at ¶¶ 46-47; 28-1 at ¶¶ 46-47.) Based upon the foregoing, the Court finds that Defendant Habshi is entitled to summary judgment on Hansen's § 1983 Fourth Amendment excessive force claim.

3.    Claim Against Defendant Ogden

As described above, Hansen and Ogden have offered competing versions as to what transpired from the time Ogden heard Canale screaming and saw Hansen restraining Canale on the couch to the time Hansen was handcuffed and placed in a patrol car. Ogden claims that upon

observing Hansen restraining Canale in a manner causing distress and believing he was choking her, he issued a series of loud verbal commands ordering Hansen to get off Canale and get down on the ground as he moved towards Hansen and before taking any physical action against Hansen. (Dkt. No. 26-3 at ¶¶ 10, 12.) According to Hansen, he heard Ogden say "stop" only a single time and briefly looked in the direction of the voice, seeing the silhouette of an individual he did not recognize as a law enforcement officer. (Dkt. Nos. 28-5 at 25-27; 28-6 at 31, 33.)

Ogden contends that as he moved closer to Hansen, Hansen turned to him and assumed a "fighting" stance, causing Ogden to immediately use a takedown technique that involved Ogden placing his foot behind Hansen's feet and using his arms and upper body to turn Hansen and take him to the floor. (Dkt. No. 26-3 at ¶¶ 12-14.) Hansen claims that Ogden grabbed his neck from behind, pulled him backwards, and then flipped him over and slammed him onto the floor, with Hansen's head striking the entertainment center, causing his head to split open and a momentary loss of consciousness.[11] (Dkt. Nos. 28-5 at 31, 33; 28-6 at 27-29.)

According to Ogden, Hansen actively resisted and repeatedly refused to follow Ogden's commands to give Ogden his hands so he could be handcuffed, leaving Ogden with no choice but to use "hard-hand techniques," which involved striking Hansen's forehead and delivering several blows to Hansen's ribs.[12] (Dkt. No. 26-3 at ¶¶ 14-15.) Ogden did not recall how many times he used the hard-hand technique on Hansen, but the record reveals that Hansen's ribs were

---

[11] According to Canale, Ogden tackled Hansen as soon as Hansen stood up and squared up like he wanted to fight with Ogden. (Dkt. No. 26-10 at 2-3.) Mechanick's deposition testimony, on the other hand, is in accord with Hansen's claim that Ogden grabbed him around the neck and slammed him to the ground. According to Mechanick, Hansen never assumed a fighting position. (Dkt. No. 26-14 at 7, 9.)

[12] Habshi, who saw Ogden striking Hansen in the ribs, supports Ogden's claim that Hansen resisted being handcuffed. (Dkt. No. 26-4 at ¶ 14.)

bruised, and Ogden injured the knuckles on his hand striking Hansen badly and went to the hospital to have it evaluated. *Id.* at ¶ 15; Dkt. Nos. 28-6 at 37; 28-17 at 4.

Hansen contends he was on his stomach on the floor with Ogden on top of him when he regained consciousness, and that Ogden struck him in the ribs with his fist four or five times. (Dkt. No. 28-17 at 3.) According to Hansen, he asked Ogden to get off him because he could not breath and complied when Ogden asked for his hands to handcuff him. Hansen claims to have first realized Ogden was a Sheriff's Department Deputy when Ogden stood him up to take him to the car. (Dkt. No. 28-5 at 25.)

While a determination by the Court as to whether Ogden's conduct in subduing and arresting Hansen was objectively reasonable as a matter of law might be appropriate were there no dispute "as to the material historical facts," the Court finds that there is such a dispute as to Ogden's use of excessive force on Hansen, as identified above, and that the competing versions of what transpired do not establish as a matter of law that either party is entitled to judgment. Rather they raise triable issues of fact for a jury to determine because "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *Kerman*, 374 F.3d at 109.

Based upon the foregoing, the Court denies Defendant Ogden's motion for summary judgment as a matter of law on Hansen's § 1983 Fourth Amendment excessive force claim. Because of the existing material issues of fact regarding Hansen's § 1983 excessive force claim, the Court finds that consideration of Ogden's motion for summary judgment on the excessive force claim on qualified immunity grounds is premature and therefore denies summary judgment

on qualified immunity grounds without prejudice to Ogden's right to renew that defense at trial. *See Johnson v. Smith*, No. 9:03CV1050 (FJS/DEP), 2006 WL 1843292, at *5 (N.D.N.Y. June 29, 2006) (adoption of recommendation that defendant's motion for summary judgment on qualified immunity grounds be denied without prejudice to renewal at trial where a jury could find defendant's action objectively unreasonable).

### C. Battery Claim Under New York State Law

#### 1. Legal Standard

Defendants Ogden and Habshi also move for summary judgment on Hansen's state law battery claim. "To succeed on an assault or battery claim in the law enforcement context, a plaintiff must demonstrate that defendants' conduct 'was not reasonable within the meaning of the New York statute concerning justification for law enforcement's use of force in the course of performing their duties.'" C*uellar v. Love,* No. 11-cv-3632 (NSR), 2014 WL 1486458, at *13 (S.D.N.Y. April 11, 2014) (quoting *Torres–Cuesta v. Berberich,* 511 F. App'x 89, 91 (2d Cir.2013) in turn quoting *Nimely v. City of New York,* 414 F.3d 381, 391 (2d Cir.2005)); *see Kavazanjian v. Rice,* No. 03-CV-1923 (FB) (SMG), 2008 WL 5340988 at *6–7 (E.D.N.Y. Dec. 22, 2008) ("To prove a civil battery claim against a police officer, a plaintiff is 'required to show that the officer made bodily contact, that the contact was offensive, and that [the officer] intended to make the contact. Additionally, [the plaintiff is] required to prove that [the officer's] conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties [*i.e.,* N.Y. Penal Law § 35.30(1)].'") (quoting *Nimely,* 414 F.3d at 391).

Essentially, the Fourth Amendment excessive force standard applies to assault and battery claims against a police officer under New York law. *Humphrey v. Landers,* 344 F. App'x

686, 688 (2d Cir. 2009) ("Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical.") (quoting *Posr v. Doherty,* 944 F.2d 91, 94–95 (2d Cir.1991)).

> 2. Analysis

The Court finds that Defendant Habshi is entitled to summary judgment on Hansen's state law battery for the same reasons articulated by the Court with respect to his § 1983 Fourth Amendment excessive force claim against Habshi. The Court, however, denies summary judgment on the state law battery claim asserted against Defendant Ogden for the same reasons set forth in the Court's analysis of Hansen's § 1983 excessive force claim against Ogden. *See Wright v. City of Buffalo*, 29 N.Y.S.3d 723 (4th Dept. 2016) (analyzing state law battery claim under the Fourth Amendment and standard of objective reasoning and finding the lower court properly denied defendants' motion for summary judgment where defendants failed to eliminate issue of facts regarding whether police officers in question used excessive force when taking decedent into custody by submitting conflicting versions regarding the amount of force used).

### D. *Respondeat Superior* Claim Against the County

Hansen has asserted a *respondeat superior* liability claim against the County with respect to his false arrest/imprisonment and battery claims against Ogden and Habshi. *Id.* Unlike cases brought under § 1983, municipalities may be liable under the theory of *respondeat superior* for intentional battery committed by law enforcement officers acting in the performance of their duties and within the scope of their employment. *See Tardif v. City of New York*, 344 F. Supp. 3d 579, 591 (S.D.N.Y. 2018) (assault and battery); *Eckardt v. City of White Plains*, 930 N.Y.S.2d 22, 25 (2d Dept. 2011) (unlike a claim pursuant to § 1983, municipality may be vicariously liable for torts committed by a police officer under the theory of *respondeat superior*). Because the

Court has denied summary judgment to Defendant Ogden on Hansen's state law intentional battery claim against him, the Court also denies summary judgment to the County on Hansen's *respondeat superior* claim arising out of Ogden's claimed battery.

**WHEREFORE**, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 26) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that the motion is **GRANTED** in its entirety as to Defendant Habshi; and it is further

**ORDERED** that the motion is **GRANTED** as to Defendants Warren County and Ogden on Plaintiff's claims for false arrest/imprisonment under both 42 U.S.C. § 1983 and New York state law; and it is further

**ORDERED** that the motion is **DENIED** as to Defendant Ogden on Plaintiff's claims for excessive force under 42 U.S.C. § 1983 and battery under New York State law, and also for qualified immunity without prejudice to renewal of the defense at trial; and it is further

**ORDERED** that the motion is **DENIED** as to Defendant Warren County solely on Hansen's *respondeat superior* claim arising out of his state law battery claim against Defendant Ogden and the motion is otherwise **GRANTED** as to Warren County.


**IT IS SO ORDERED.**


Dated: February 15, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge